# STATE OF MICHIGAN

# COURT OF APPEALS

AGILITY HEALTH, L.L.C.,

Plaintiff/Counter-Defendant-
Appellee/Cross-Appellant,

v

FPCG HEALTH, L.L.C., d/b/a FORBES
PRIVATE CAPITAL GROUP,

Defendant/Counter-Plaintiff-
Appellant/Cross-Appellee.

UNPUBLISHED
July 28, 2016

No. 324571
Kent Circuit Court
LC No. 13-000830-CK

Before: METER, P.J., and BOONSTRA and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right the trial court's October 27, 2014 judgment. Plaintiff cross-appeals. Three orders entered by the trial court are at issue: (1) the April 11, 2014 order, in which the trial court granted summary disposition to defendant on all claims and counterclaims except unjust enrichment; (2) the July 25, 2014 order, in which the trial court held that defendant was not entitled to an award of attorney fees; and (3) the October 10, 2014 order, in which the trial court held that Michigan law, rather than New York law, governed the award of prejudgment interest. We affirm in part, reverse in part, and remand this case for further proceedings.

## I. BACKGROUND

Plaintiff Agility Health, L.L.C. ("Agility Health"), headquartered in Grand Rapids, Michigan, provides physical therapy services to healthcare providers and employers. In 2010 and 2011, plaintiff began raising capital and sought to become a public company listed on a Canadian stock exchange. Plaintiff initially engaged Bloom Burton & Company ("Bloom Burton"), a Canadian investment bank, to assist in identifying potential investors. Ultimately, this attempt was not as successful as plaintiff had hoped. In 2012, it broadened its efforts and undertook a new search for capital by contacting investment bankers in the United States, including defendant Forbes.

On April 2, 2012, plaintiff and defendant signed an engagement letter in which defendant agreed to act as plaintiff's "exclusive placement agent in the United States and non-exclusive placement agent outside of the United States in connection with an offering of preferred,

-1-

common stock, or subordinated debt . . . in a proposed private placement . . . (the 'Transaction'), on the terms and conditions set-forth below." "The Transaction [would] not include any . . . (iii) sales to Company Investors or sales to Canadian investors except that any sale to (a) OMERS (Ontario Municipal Employees Retirement System) or (b) OTPP (Ontario Teachers Pension Plan) shall be included in the definition of a Transaction." The terms and conditions of the engagement letter included a compensation provision. Plaintiff would, in part, pay defendant "a placement fee" that was equal to "6.0% of the gross proceeds of any Transaction[.]" The engagement letter also included a choice-of-law provision, under which the parties agreed that the letter would be construed in accordance with the laws of New York, and it had an indemnity provision.

At some point, Bloom Burton, the Canadian investment bank, contacted Alaris Royalty Group ("Alaris Royalty") about investing in plaintiff.[1] Alaris Royalty is a public Canadian corporation that provides financing to private businesses in North America. It worked with Bloom Burton to conduct due diligence on plaintiff and never had any contact with defendant. Alaris Royalty then sent a term sheet to plaintiff, in which it proposed an investment of $15 million in plaintiff. In July 2012, plaintiff forwarded the term sheet to defendant. Plaintiff requested that defendant review and evaluate the investment terms offered by Alaris Royalty. Defendant criticized the proposed Alaris Royalty investment, which was a debt financing rather than an equity financing, as not being in plaintiff's best interest.

In October 2011, before it considered investing in plaintiff, Alaris Royalty formed an independent subsidiary, Alaris USA, Inc. ("Alaris USA"), a Delaware corporation. Alaris Royalty wholly owns and controls Alaris USA. According to Steve King, the president and chief executive officer of Alaris Royalty, the sole purpose for creating Alaris USA was to acquire and hold interests in American entities that were to be financed directly or indirectly by Alaris Royalty. In fact, all of Alaris USA's financial activities are conducted by way of capital contributions or loans from Alaris Royalty.

On December 12, 2012, Alaris USA closed on a transaction with plaintiff. Alaris USA gave plaintiff $12.5 million for 1,250 class B membership units in plaintiff. It is undisputed that the acquisition of membership units in plaintiff was the result of an indirect investment by Alaris Royalty in its subsidiary Alaris USA. Since December 2012, plaintiff has paid more than $1.5 million to Alaris USA in distributions and interest. Distributions that Alaris USA receives from plaintiff are eventually transmitted back to Alaris Royalty.

## II. BREACH OF CONTRACT

On cross-appeal, plaintiff argues that the trial court erred in granting summary disposition to defendant on its complaint for declaratory relief and on defendant's counterclaim for breach of

---

[1] Defendant acknowledges that it was not responsible for introducing Alaris Royalty to Agility Health. Under New York law, a broker or investment banker can earn a fee without procuring the underlying deal if the language of the contract so provides. *CV Holdings, LLC v Artisan Advisors, LLC*, 9 AD3d 654, 656-657; 780 NY2d 425 (2004).

contract. According to plaintiff, Alaris Royalty, not its subsidiary Alaris USA, was the actual investor in plaintiff. Because in substance, plaintiff argues, a Canadian company financed the investment in plaintiff, there was no "Transaction" as defined by its agreement with defendant, and it is not liable to defendant for a placement fee. We disagree.

We review *de novo* a trial court's decision on a motion for summary disposition. *Moser v Detroit*, 284 Mich App 536, 538; 772 NW2d 823 (2009). Summary disposition is appropriate under MCR 2.116(C)(10) if, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law."

The parties agree that, pursuant to the choice-of-law provision, the laws of New York govern whether plaintiff breached the engagement letter. Under New York law, the "fundamental, neutral precept" of contract interpretation is that the contract must be construed in accordance with the parties' intent. *Greenfield v Philles Records, Inc*, 98 NY2d 562, 569; 780 NE2d 166 (2002). The best evidence of the parties' intent is the language of the contract. *Id.* "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.* Extrinsic evidence of the parties' intent may be considered only if the language is ambiguous. *Id.*; see also *Brad H v City of New York*, 17 NY3d 180, 186; 951 NE2d 743 (2011) ("Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement and, therefore, extrinsic evidence may be considered only if the agreement is ambiguous.") (quotation omitted). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Greenfield*, 98 NY2d at 569. In other words, a contract is ambiguous if, on its face, it is susceptible to more than one reasonable interpretation. *Brad H*, 17 NY3d at 186; *Greenfield*, 98 NY2d at 569-570. Words and phrases in a contract must be given their plain meaning. *Brooke Group Ltd v JCH Syndicate 488*, 87 NY2d 531, 534; 663 NE2d 635 (1996). A dictionary may be consulted to determine the plain meaning of a word. See *Universal American Corp v Nat'l Union Fire Ins Co of Pittsburgh*, 25 NY3d 675, 681; 37 NE3d 78 (2015).

Under the engagement letter, plaintiff promised to pay defendant a placement fee equal to six percent of the gross proceeds of "any Transaction." A "Transaction" was defined as an offering of plaintiff's preferred, common stock or subordinated debt in a proposed private placement for the purpose of raising capital, funding plaintiff's operations, and making distributions to the existing shareholders. Carved out from the definition of "Transaction" were any "sales to Canadian investors," except to OMERS and OTPP.

There is nothing ambiguous about the engagement letter. On its face, it is not reasonably susceptible to more than one interpretation. *Brad H*, 17 NY3d at 186; *Greenfield*, 98 NY2d at 569-570. It states unequivocally that defendant is entitled to a placement fee equal to six percent of the gross proceeds of any "Transaction" to any entity other than a Canadian investor, with the exception of OMERS or OTPP. Because the engagement letter is unambiguous, it must be

enforced according to the plain meaning of its terms. *Greenfield*, 98 NY2d at 569. As Alaris USA is not a Canadian investor, reasonable minds could not disagree that defendant is entitled to its fee from plaintiff under the terms of the parties' engagement letter.[2]

Alaris USA and plaintiff were the two parties to the exchange of $12.5 million for 1,250 class B membership units in plaintiff. Because the business of a subsidiary is not the business of the subsidiary's parent, Alaris Royalty was not a party to the transaction. *Connecticut Gen Life Ins Co v Superintendent of Ins of New York*, 10 NY2d 42, 50; 176 NE2d 63 (1961). A subsidiary and its parent are separate corporations. *JPMorgan Chase Bank NA v Malarkey*, 65 AD3d 718, 721; 884 NYS2d 787 (2009). Separate corporate entities are generally respected even when one corporation may wholly own another or when they share the same principals. *Application of Crespo*, 123 Misc 2d 862, 865; 475 NYS2d 319 (1984). It is undisputed that Alaris USA was the sole investor in plaintiff. Further, while there is no dispute that Alaris USA is a subsidiary of Alaris Royalty, it also is undisputed that Alaris USA is a Delaware corporation and is not domiciled in Canada.

Based on the applicable rules of contract interpretation, no reasonable person could conclude that the investor was anything other than Alaris USA, a Delaware corporation. As the trial court observed, even if the Alaris USA principals were Canadians and Canadian money funded the Alarais USA transaction, it was not a Canadian company that entered into the transaction with plaintiff; it was Alaris USA.

Plaintiff urges us not to use a "formalistic" approach and to recognize that contracts are made by people and should be interpreted according to the "reasonable" expectations of those people. Plaintiff fails to recognize that the very purpose of a written contract is to capture, in a formalistic and binding form, the subjective expectations of the parties. It is not our role to glean subjective intent when the document executed by the parties is unambiguous. It is the unambiguous written agreement between the parties that captures the parties' subjective intent, and it is not proper for us to disturb the written document simply because one party later regrets entering into the agreement, as appears to be the case with plaintiff here.

While the drafting of a contract or an agreement may sometimes be imperfect, it often may be the case that the imperfection is the consequence of a compromise between the parties. It is not the function of the Court to disregard the words adopted by the parties to the contract. If the parties to the agreement at issue intended that defendant be precluded from receiving a placement fee for sales to U.S. entities which have Canadian investors, that language should

---

[2] As a matter of procedure, the Michigan Supreme Court has stated that it "is axiomatic that if a word or phrase [in a contract] is unambiguous and no reasonable person could differ with respect to application of the term or phrase to undisputed material facts, then the court should grant summary disposition to the proper party pursuant to MCR 2.116(C)(10)." *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 353; 596 NW2d 190 (1999). But, "if reasonable minds could disagree about the conclusions to be drawn from the facts, a question for the factfinder exists." *Id.*

have been included in the engagement letter. However, it was not. We cannot now re-draft the engagement letter in plaintiff's favor.

## III. GOVERNING LAW – PREJUDGMENT INTEREST

Defendant argues that the trial court erred in holding in its October 10, 2014 order that Michigan law, rather than New York law, governs an award of prejudgment interest.[3] We review *de novo* a trial court's decision on a motion for summary disposition. *Moser*, 284 Mich App at 538. We also review *de novo* the interpretation of a written contract, *Reicher v SET Enterprises*, 283 Mich App 657, 664; 770 NW2d 902 (2009), and issues concerning conflicts of law, *Talmer Bank & Trust v Parikh*, 304 Mich App 373, 383; 848 NW2d 408 (2014), vacated in part on other grounds 497 Mich 857 (2014).

The choice-of-law provision in the engagement letter provided: "This agreement shall be governed by and construed in accordance with the laws of the state of New York without regard to the conflict of law principals [sic] thereof." When interpreting a contract, this Court's obligation is to determine the intent of the contracting parties. *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003). If the language of the contract is unambiguous, the Court must construe and enforce the contract as written. *Id.* "Thus, an unambiguous contractual provision is reflective of the parties' intent as a matter of law. Once discerned, the intent of the parties will be enforced unless it is contrary to public policy." *Id.* The Court must give effect to every word, phrase, and clause in a contract, and avoid any interpretation that would render any part of the contract surplusage or nugatory. *Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership*, 295 Mich App 99, 111; 812 NW2d 799 (2011). Words in a contract must be given their plain and ordinary meaning. *Holland v Trinity Health Care Corp*, 287 Mich App 524, 527; 791 NW2d 724 (2010). The Court may consult a dictionary to determine the plain and ordinary meaning of words undefined by the contract. *Id.* at 527-528.

In an action in Michigan on a foreign contract, while the validity and construction of the contract may be controlled and determined by the laws of another state, the law of Michigan applies to issues of procedure and remedy. See *McColl v Wardowski*, 280 Mich 374, 377; 273 NW 736 (1937); *Mitchell v Reolds Farms Co*, 268 Mich 301, 311-312; 256 NW 445 (1934); *Mt Ida Sch for Girls v Rood*, 253 Mich 482, 490; 235 NW 227 (1931). This rule applies even when the contract contains a choice-of-law provision. See *Rubin v Gallagher*, 294 Mich 124, 128; 292 NW 584 (1940).

In *OrbusNeich Med Co v Boston Scientific Group*, 694 F Supp 2d 106, 114 (D Mass, 2010), the federal district court held that the choice-of-law provision, which stated that the contract was "governed by the Laws of the Commonwealth of Massachusetts, USA, without regard for the conflicts of law provisions," indicated that the parties intended that all aspects of

---

[3] New York law provides for a substantially higher rate of prejudgment interest than does Michigan law. See MCL 600.6013(8); NY CPLR Law 5004. It also allows for prejudgment interest to begin accruing at the earliest ascertainable date the cause of action existed, NY CPLR Law 5001(b), rather than the date the complaint was filed, MCL 600.6013(8).

Massachusetts law, whether substantive or procedural, governed the contract. It explained that, had the parties only intended for the contract to be governed by Massachusetts substantive law, the choice-of-law provision needed to state nothing more than the agreement was to be governed by Massachusetts law. *Id.* But, the choice-of-law provision contained the additional phrase "without regard for the conflicts of law provisions," and this phrase could only be interpreted as a statement of the parties' intent that the court should disregard all conflicts-of-law provisions that could apply. *Id.*

Unlike the choice-of-law provision in *OrbusNeich Med Co*, the choice-of-law provision in the engagement letter ended with the word "thereof." Meaning must be given to this word. *Wells Fargo Bank, NA*, 295 Mich App at 111. It is defined, in pertinent part, as "of that or it." *Merriam-Webster's Collegiate Dictionary* (11th ed). Thus, the word "thereof" in the choice-of-law provision must refer to something, and it can only refer to the laws of New York. Consequently, the choice-of-law provision provides that the engagement letter shall be governed by, and construed in accordance with, the laws of New York without regard to the conflict-of-law principles of New York. By including the word "thereof" at the end of the choice-of-law provision, the parties limited the choice-of-law principles that did not apply to those of New York.

Michigan has its own conflicts-of-law jurisprudence, and Michigan courts apply that jurisprudence in determining whether Michigan law or the law of another state applies to a cause of action. See, e.g., *Sutherland v Kennington Truck Serv, Ltd*, 454 Mich 274, 278-290; 562 NW2d 466 (1997); *Talmer Bank*, 304 Mich App at 385-403. Because the present action was filed in Michigan, Michigan's conflicts-of-law principles apply to the determination of whether Michigan law or New York law governs the award of prejudgment interest. Accordingly, the clause in the choice-of-law provision that no regard should be given to New York's conflicts-of-law principles has no effect on the present case.

As previously stated, the Michigan Supreme Court has held that, even where a contract is governed by the laws of another state, Michigan law applies to issues of procedure and remedy. *Rubin*, 294 Mich at 128. Additionally, the Supreme Court has held that Michigan law applies to an award of interest for a breach of a contract, even when the contract is governed by the laws of another state. *Mitchell*, 268 Mich at 311-312. Based on *Mitchell*, the trial court did not err in holding that the award of prejudgment interest was governed by Michigan law. We acknowledge that our holding is inconsistent with the Restatement (Second) of Conflict of Laws. However, the holding is based on the decisions of the Supreme Court, which we are bound to follow. *Paige v Sterling Heights*, 476 Mich 496, 524; 720 NW2d 219 (2006). We affirm the trial court's October 10, 2014 order.

## IV. ATTORNEY FEES

Defendant also argues that the trial court erred in holding in its July 25, 2014 order that it was not entitled to an award of attorney fees. We review *de novo* a trial court's decision on a motion for summary disposition. *Moser*, 284 Mich App at 538.

The indemnity provision in the engagement letter provided:

Each party shall indemnify and hold harmless the other party and its respective affiliates, officers, directors, employees and agents (collectively, the "Indemnified Parties") from and against any and all losses, claims, damages and liabilities (including reasonable attorney's fees) arising out of or in connection with this Agreement that are directly caused by that party's breach of this Agreement or violation of any applicable laws in connection with its performance hereunder; provided that this indemnification shall not apply to any loss, claim, damage or liability that is found to have resulted from bad faith, gross negligence, willful misconduct, fraudulent misrepresentation or breach of this [sic] terms of this Agreement by an Indemnified Party.

The parties agree that, pursuant to the choice-of-law provision in the engagement letter, New York law governs whether defendant, prevailing on its breach of contract claim, is entitled to attorney fees.

Under New York law, "attorney's fees are incidents of litigation and a prevailing party may not collect them from the [losing party] unless an award is authorized by agreement between the parties, statute, or court rule[.]" *Hooper Assoc, Ltd v AGS Computers, Inc*, 74 NY2d 487, 491; 548 NE2d 903 (1989). In *Hooper Assoc*, the New York Court of Appeals stated,

Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise. [*Id*. at 492.]

In determining whether an indemnity provision allows attorney fees in a breach of contract action between the contracting parties, a court must give fair meaning to all the language used in the contract, and it must leave no provision in the contract without force and effect. *Id*. at 493.

We conclude that the trial court erred in determining that defendant, upon prevailing in its breach of contract claim, was not entitled to an award of attorney fees. The language in the indemnity provision was "extremely broad." *Crossroads ABL, LLC v Canaras Capital Mgt*, 105 AD3d 645, 646; 963 NYS2d 645 (2013). It provided, in pertinent part, that each party was to indemnify the other party "from and against any and all losses, claims, damages and liabilities (including reasonable attorney's fees) arising out of or in connection with this Agreement that are directly caused by that party's breach." Additionally, the indemnity provision did not include an exhaustive list of actions for which indemnification would be required (and which were third-party claims), nor did the engagement letter contain any provisions that would be rendered meaningless if the indemnity provision were to include claims between the parties. See *Hooper Assoc*, 74 NY2d at 492-493. It did not contain a provision that requires a party to promptly notify the other party of any claim or litigation to which the indemnity provision might apply or a provision that the other party may assume the defense of such a claim or litigation. See *id*.

Moreover, under the indemnity provision, a party must indemnify the other party for its losses that are directly caused by that party's (1) breach of the engagement letter or (2) violation

-7-

of any applicable laws. The only third-party claims that plaintiff has identified that could arise from a breach of the engagement letter were based on violations of applicable laws. Because third-party claims that arise from either party's breach of the engagement letter are also based on violations of applicable laws, then the second clause in the indemnity provision—*i.e.*, that a party must indemnify the other party for its losses that are caused by that party's violation of any applicable laws—is rendered superfluous unless the first clause—*i.e.*, that a party must indemnify the other party for its losses that are caused by that party's breach of the engagement letter—includes first-party claims. If the first clause is limited to third-party claims, and third-party claims can be based on a party's violations of applicable laws, the second clause has no meaning. This result must be avoided. *Hooper Assoc*, 74 NY2d at 493; see also *Nat'l Union Fire Ins Co of Pittsburgh v Williams*, 223 AD2d 395, 397; 637 NYS2d 36 (1996) (stating that, under New York law, a fundamental principle of contract interpretation is that no provision of a contract should be rendered surplusage). Accordingly, the inclusion of the two clauses in the indemnity provision indicates that the parties intended for the indemnity provision to apply to first-party claims.

We reverse the trial court's July 25, 2014 order regarding attorney fees.

## V. CONCLUSION

We affirm the trial court's April 11, 2014 grant of summary disposition to defendant, reverse the July 25, 2014 order regarding attorney fees, and affirm the October 10, 2014 order regarding prejudgment interest. We remand this case for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Michael J. Riordan

-8-