# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF PATRICIA E. LEBLANC, by
SUZANNE RUBBA and DANIEL LEBLANC,
Personal Representatives,

        Plaintiff-Appellant,

v

EUGENE J. AGNONE, M.D., and MICHIGAN
CANCER SPECIALISTS, PLC,

        Defendants-Appellees,

and

CHAKRPANI RANGANATHAN, M.D.,
MICHAEL F. ROMANELLI, M.D., MACOMB
NEUROLOGY ASSOCIATES, PC, and WOODS
CARDIOVASCULAR INTERNAL MEDICINE
ASSOCIATES, PC,

        Defendants.

UNPUBLISHED
July 6, 2017

No. 330330
Macomb Circuit Court
LC No. 2013-002255-NH

ESTATE OF PATRICIA E. LEBLANC, by
SUZANNE RUBBA and DANIEL LEBLANC,
Personal Representatives,

        Plaintiff-Appellee,

v

EUGENE J. AGNONE, M.D., CHAKRPANI
RANGANATHAN, M.D., MICHIGAN CANCER
SPECIALISTS, PLC, and MACOMB
NEUROLOGY ASSOCIATES, PC,

        Defendants,

and

No. 330416
Macomb Circuit Court
LC No. 2013-002255-NH

-1-

MICHAEL F. ROMANELLI, M.D., and WOODS
CARDIOVASCULAR INTERNAL MEDICINE
ASSOCIATES, PC,

      Defendants-Appellants.

---

Before: FORT HOOD, P.J., and CAVANAGH and RONAYNE KRAUSE, JJ.

PER CURIAM.

These two interlocutory consolidated appeals arise from the same medical malpractice case. In Docket No. 330330, plaintiff appeals by leave granted[1] an order granting the motion of defendants Eugene J. Agnone, M.D., and Michigan Cancer Specialists, PLC (MCS), to disqualify plaintiff's proposed expert in medical oncology, Gerald Sokol, M.D., from testifying regarding the standard of practice applicable to Dr. Agnone. In Docket No. 330416, defendants Michael F. Romanelli, M.D., and Woods Cardiovascular Internal Medicine Associates, PC (Woods), appeal by delayed leave granted[2] four orders: (1) an order denying the motion of Dr. Romanelli and Woods to strike plaintiff's proposed cardiology expert, Arthur Meltzer, M.D., or to preclude his testimony; (2) an order denying the motion of Dr. Romanelli and Woods to strike Dr. Meltzer's testimony regarding his standard of care criticism that the chemotherapeutic agent Novantrone must be discontinued when a patient has a 10% decrease in ejection fraction; (3) an order denying the motion of Dr. Romanelli and Woods to strike Dr. Meltzer's allegedly new standard of care criticisms; and (4) an order denying the motion of Dr. Romanelli and Woods to strike the testimony of Dr. Meltzer and Dr. Sokol regarding proximate causation. We affirm in both appeals.

Plaintiff commenced this medical malpractice action alleging that plaintiff's decedent, Patricia E. LeBlanc (Patricia) (date of birth 07/27/1940), died on July 12, 2010, as a result of cardiogenic shock caused by the purportedly excessive and inappropriate administration of a chemotherapeutic drug called Novantrone between August 2008 and November 2009. In May 2008, defendant Chakrpani Ranganathan, M.D., a neurologist employed by defendant Macomb Neurology Associates, PC, diagnosed Patricia with progressing relapsing multiple sclerosis (MS). Dr. Ranganathan referred Patricia to Dr. Agnone, a medical oncologist employed by MCS, for the intravenous administration of Novantrone, a chemotherapeutic drug, as a form of treatment for Patricia's MS. Patricia was also referred to a cardiologist, Dr. Romanelli, who was employed by Woods, for a cardiac evaluation in connection with the administration of Novantrone. In July 2008, Dr. Romanelli's office determined that Patricia's ejection fraction,

---

[1] *LeBlanc Estate v Agnone*, unpublished order of the Court of Appeals, entered May 31, 2016 (Docket No. 330330).

[2] *LeBlanc Estate v Agnone*, unpublished order of the Court of Appeals, entered May 31, 2016 (Docket No. 330416).

i.e.., the percentage of blood pumped out of a filled ventricle with each heartbeat, was 76%. In August 2008, Patricia began receiving 20 milligram doses of Novantrone administered by Dr. Agnone every four to six weeks, eventually receiving a total of 16 doses. According to plaintiff, the appropriate dosage for Patricia given her body surface area was 24.72 milligrams every three months, and her appropriate lifetime dosage was 288.4 milligrams. On the date of Patricia's sixth treatment, in January 2009, Dr. Agnone noted that Patricia had recent dyspnea (difficult or labored breathing) and that her ejection fraction was 62% according to Dr. Romanelli. By the time Patricia received her final dose in November 2009, she had received a lifetime total of 300 milligrams of Novantrone. The Novantrone was then discontinued after an echocardiogram showed that her ejection fraction was between 50% and 55%. In January 2010, Patricia was found to be suffering from cardiac toxicity as a result of taking Novantrone; she suffered congestive heart failure and cardiomyopathy (heart disease leading to decreased function). In February 2010, Patricia underwent a mitral valve repair. She later suffered respiratory failure, cardiogenic shock, and failure of multiple organs, ultimately dying in July 2010 of cardiogenic shock. Plaintiff alleged medical malpractice on the part of each defendant physician regarding the purportedly excessive doses of Novantrone administered to Patricia and negligence in the failure to ensure the appropriate assessment of Patricia for cardiac signs and symptoms before the administration of each dose of Novantrone; plaintiff also asserted vicarious liability of the respective entity defendants employing each defendant physician. The trial court decided several motions in limine, five of which are the subject of these appeals.

In Docket No. 330330, plaintiff argues that the trial court abused its discretion in concluding that Dr. Sokol lacked the requisite qualification under MCL 600.2169(1)(b) to testify as an expert in medical oncology concerning the standard of care applicable to Dr. Agnone. We disagree.

A trial court's ruling regarding the qualification of a proposed expert witness to testify at trial is reviewed for an abuse of discretion. *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). A trial court's decision whether to admit evidence is also reviewed for an abuse of discretion. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes. *Id.*; *Woodard*, 476 Mich at 557. This Court reviews de novo questions of law underlying evidentiary rulings, such as the interpretation of court rules and statutes. *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016).

As our Supreme Court explained in *Elher*, 499 Mich at 21-22:

> A plaintiff in a medical malpractice action must establish (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Generally, expert testimony is required in a malpractice case in order to establish the applicable standard of care and to demonstrate that the professional breached that standard. An exception exists when the professional's breach of the standard of care is so obvious that it is within the common knowledge and experience of an ordinary layperson. The proponent of the evidence has the burden of establishing its relevance and admissibility. [Quotation marks, footnotes and citations omitted.]

MCL 600.2169 provides, in relevant part:

(1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

(b) Subject to subdivision (c) [pertaining to general practitioners and which is not applicable here], during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

(*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

"The proponent of expert testimony in a medical malpractice case must satisfy the court that the expert is qualified under . . . MCL 600.2169." *Elher*, 499 Mich at 22 (footnote and citation omitted).

In *Woodard*, 476 Mich at 559, our Supreme Court explained that MCL 600.2169(1) "requires the matching of a singular specialty, not multiple specialties." After taking note of the requirement in MCL 600.2169(1)(b) that the plaintiff's expert must have devoted a majority of his or her professional time to practicing or teaching the same specialty as the defendant physician in the year immediately preceding the alleged malpractice, the *Woodard* Court stated:

Obviously, a specialist can only devote a *majority* of his professional time to *one* specialty. Therefore, it is clear that §2169(1) only requires the plaintiff's expert to match one of the defendant physician's specialties. Because the plaintiff's expert will be providing expert testimony on the appropriate or relevant standard of practice or care, not an inappropriate or irrelevant standard of practice or care, it follows that the plaintiff's expert witness must match the one most relevant standard of practice or care – the specialty engaged in by the defendant physician during the course of the alleged malpractice, and, if the defendant physician is

-4-

board certified in that specialty, the plaintiff's expert must also be board certified in that specialty. [*Woodard*, 476 Mich at 560.]

"[A] 'specialty' is a particular branch of medicine or surgery in which one can potentially become board certified." *Id*. at 561.

[A] 'subspecialty' is a particular branch of medicine or surgery in which one can potentially become board certified that falls under a specialty or within the hierarchy of that specialty. A subspecialty, although a more particularized specialty, is nevertheless a specialty. Therefore, if a defendant physician specializes in a subspecialty, the plaintiff's expert witness must have specialized in the same subspecialty as the defendant physician at the time of the occurrence that is the basis for the action. [*Id*. at 562 (footnote omitted).]

Also, "the proposed expert witness must have the same board certification as the party against whom or on whose behalf the testimony is offered." *Id*. at 562-563 (quotation marks and citation omitted). A certificate of special or added qualifications constitutes a board certificate. *Id*. at 565. Hence, "if a defendant physician has received a certificate of special qualifications, the plaintiff's expert witness must have obtained the same certificate of special qualifications in order to be qualified to testify under §2169(1)(a)." *Id*. (footnote omitted).

The *Woodard* Court also provided the following explanation concerning the requirement in MCL 600.2169(1)(b) that an expert witness must have devoted a majority of his or professional time in the year immediately preceding the date of the alleged malpractice to practicing or teaching the same specialty as the defendant physician:

As we explained above, one cannot devote a "majority" of one's professional time to more than one specialty. Therefore, in order to be qualified to testify under §2169(1)(b), the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the same specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty. [*Woodard*, 476 Mich at 566 (footnote omitted).]

The *Woodard* Court further explained:

Just as a subspecialty is a specialty within the meaning of §2169(1)(a), a subspecialty is a specialty within the meaning of §2169(1)(b). Therefore, if the defendant physician specializes in a subspecialty and was doing so at the time of the alleged malpractice, the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching that subspecialty. [*Id*. at 566 n 12.]

For these reasons, "the plaintiff's expert does not have to match all of the defendant physician's specialties; rather, the plaintiff's expert only has to match the one most relevant specialty." *Id*. at 567-568.

In *Woodard*, 476 Mich at 554-555, the defendant physician was board certified in pediatrics with certificates of special qualifications in pediatric critical care medicine and neonatal-perinatal medicine, whereas the plaintiff's proposed expert was board certified in pediatrics without any certificates of special qualifications. The defendant physician was practicing pediatric critical care medicine at the time of the alleged malpractice, and pediatric critical care medicine thus constituted "the one most relevant specialty." *Id*. at 576. Because the plaintiff's proposed expert did not specialize in pediatric critical care medicine at the time of the alleged malpractice, the proposed expert did not satisfy the same specialty requirement of MCL 600.2169(1)(a). *Id*. at 576-577. The plaintiff's proposed expert also did not satisfy the same practice or instruction requirement of MCL 600.2169(1)(b) because the proposed expert did not practice or teach pediatric critical care medicine during the year immediately preceding the alleged malpractice. *Id*. at 577. The trial court in *Woodard* therefore did not abuse its discretion in concluding that the plaintiff's proposed expert was not qualified to testify regarding the appropriate standard of practice or care under MCL 600.2169(1). *Id*.

The *Woodard* Court also applied its holdings to the companion case of *Hamilton v Kuligowski*, which was consolidated with *Woodard*. *Woodard*, 476 Mich at 577-578. In *Hamilton*, the defendant physician was board certified in general internal medicine and specialized in general internal medicine. *Id*. at 556. The plaintiff's proposed expert was board certified in general internal medicine but devoted a majority of his professional time to the treatment of infectious diseases, which is a subspecialty of internal medicine. *Id*. The trial court granted a directed verdict in favor of the defendant physician, reasoning that the plaintiff's proposed expert was not qualified given that he specialized in infectious diseases and did not spend a majority of his professional time practicing or teaching general internal medicine. *Id*. This Court reversed, stating that the proposed expert and the defendant physician both specialized in internal medicine and that the proposed expert devoted "a majority of his professional time to the practice of internal medicine given that the treatment of infectious diseases is a subspecialty of internal medicine." *Id*. at 556-557 (summarizing this Court's reasoning). Our Supreme Court reversed this Court's decision and held that the trial court had properly granted a directed verdict to the defendant physician. *Id*. at 579. Our Supreme Court explained:

> The defendant physician specializes in general internal medicine and was practicing general internal medicine at the time of the alleged malpractice. During the year immediately preceding the alleged malpractice, plaintiff's proposed expert witness did not devote a majority of his time to practicing or teaching general internal medicine. Instead, he devoted a majority of his professional time to treating infectious diseases. As he himself acknowledged, he is "not sure what the average internist sees day in and day out." Therefore, plaintiff's proposed expert witness does not satisfy the same practice/instruction requirement of §2169(1)(b).

> For this reason, the trial court did not abuse its discretion in concluding that plaintiff's proposed expert witness is not qualified to testify regarding the appropriate standard of practice or care under §2169(1). Because plaintiff failed to present an expert qualified under §2169(1) to testify with regard to the

appropriate standard of practice or care, the trial court properly granted a directed verdict in favor of defendant. [*Id.* at 577-578.]

In *Kiefer v Markley*, 283 Mich App 555, 559; 769 NW2d 271 (2009), this Court applied the holding in *Woodard* and noted that the word "majority" means "the greater part or larger number; more than half of a total." (Quotation marks and citation omitted.) "MCL 600.2169(1)(b), therefore, requires a proposed expert physician to spend greater than 50 percent of his or her professional time practicing the relevant specialty the year before the alleged malpractice." *Kiefer*, 283 Mich App at 559. Because the plaintiffs' proposed expert devoted only 30 to 40 percent of his time to the practice of hand surgery, which was the one most relevant specialty in that case, the proposed expert was not qualified under MCL 600.2169(1)(b). *Kiefer*, 283 Mich App at 559. The majority of the panel in *Kiefer* expressed respectful disagreement with Judge O'Connell's dissenting view that the term "majority" means "an amount that represents the largest percentage of the whole, even if this amount is less than 50 percent." *Id.* at 558 n 1 (quotation marks omitted). The *Kiefer* majority explained:

> Let us consider a situation where a doctor spends 40 percent of his time in one area, 40 percent in a second area, and 20 percent in a third. Under our colleague's definition, this hypothetical doctor would then be in the position of devoting the "majority" of his time to two different specialties. Because the *Woodard* Court maintained that this is impossible, it is clear that the *Woodard* Court relied on a definition of "majority" as "an amount that exceeds 50 percent of the total." [*Id.*]

Despite concluding that the plaintiffs' proposed expert was not qualified to testify at trial under MCL 600.2169(1)(b), the *Kiefer* majority made the following observation:

> Given the unambiguous language of the statute and the caselaw on this issue, this panel is constrained to affirm the trial court's decision [striking the plaintiffs' proposed expert witness]. However, we note that this is not a result we think the Legislature intended. Defendant Dr. John M. Markley was board-certified in plastic surgery with an added qualification in hand surgery, as was [the plaintiffs' proposed expert witness,] Dr. [Frederick A.] Valauri. We believe that this similarity, coupled with the fact that Dr. Valauri spent more than 50 percent of his time in the area of hand surgery and the closely related area of reconstructive surgery of other extremities, should qualify him as an expert in this situation. Nonetheless, we reluctantly hold that the trial court did not abuse its discretion by granting defendants' motion in limine to strike plaintiffs' expert witness. [*Kiefer,* 283 Mich App at 559-560 (citations omitted).]

In this case, the parties are in agreement that the one most relevant specialty, i.e., the specialty that defendant-physician Dr. Agnone was practicing at the time of the alleged malpractice, was medical oncology. It is undisputed that Dr. Agnone is board certified in internal medicine and medical oncology, which is a subspecialty of internal medicine. Plaintiff's proposed expert witness in medical oncology, Dr. Sokol, is, like Dr. Agnone, board certified in

internal medicine and medical oncology.  But unlike Dr. Agnone, Dr. Sokol is board certified in numerous other specialties, including radiation oncology (also known as therapeutic radiology),[3] clinical pharmacology, skin cancer medicine, and quality assurance and utilization review.[4]  The issue is therefore whether Dr. Sokol devoted a majority of his professional time to practicing or teaching medical oncology during the year immediately preceding the date of the alleged malpractice.

In his affidavit of merit filed with the complaint, Dr. Sokol made the following assertion: "I further certify that during the year immediately preceding the date of the occurrence that is the basis for this claim, I devoted a majority of my professional time to the active clinical practice of Medical Oncology and/or the instruction of students in an accredited health professional school or clinical research program in Medical Oncology."  Despite this conclusory claim in the affidavit of merit, Dr. Sokol's testimony regarding this issue at his trial deposition was decidedly less clear or coherent.  Early in the direct examination of Dr. Sokol, plaintiff's counsel asked whether Dr. Sokol devoted a majority of his professional time to the clinical practice of "oncology" during the relevant time period, without specifying whether the question pertained to medical oncology, radiation oncology, or both.  Dr. Sokol responded, "Well, at least 30 hours, maybe more, a week.  In addition to that, teaching in that area and, of course, the Center for Drug Research, which is kind of a supervisory overview of a lot of – lot of medicine."

On cross-examination, Dr. Sokol's testimony failed to establish that he devoted a majority of his professional time to practicing or teaching medical oncology during the relevant time period.  For example, he testified:

*Q*.  When we took your deposition in July of last year, you could not state what percentage of your time was in medical oncology versus only radiation oncology.  Isn't that true?

*A*.  Well, because obviously I draw upon all my specialties and trainings every time I see a given patient.

\* \* \*

*Q*.  Therefore, you cannot as you could not back in 19 – or 2014, you cannot state – state what percentage of your day-to-day practice is in medical oncology.  Right?

*A*.  Not exactly.  I told you that – that there is a special benefit of having practiced medical oncology or radiation oncology drawing upon all of those experience[s].  I hope you're not – I hope you're not criticizing me for being overtrained to do it.

---

[3] Dr. Sokol acknowledged that radiation oncology is a different certification from medical oncology.

[4] The skin cancer medicine certification is from Australia rather than the United States.

* * *

*Q.* . . . What percentage of your day-to-day practice is in radiation oncology, for example?

*A.* What percentage is in radiation oncology? I don't know how to answer that question when I draw upon every specialty when I see a patient. And – and this patient would be a perfect example – a perfect example of why it's important to do so.

*Q.* Just answer my question now. Okay.

*A.* I just told you that I can't answer it because I draw upon all those specialties. And I will add that it's in a patient like this probably critically important that I do.

Later, Dr. Sokol testified that he spends 20 hours a week in medical oncology at the Center for Drug Research. Dr. Sokol stated that "whatever standard you want to meet, I believe that I spent enough time in medical oncology and pharmacology and internal medicine to qualify for that [standard]." Dr. Sokol further testified:

*Q.* Okay. And you have given opinions over the years that you cannot in your mind state what percentage of your practice is in either therapeutic radiation oncology or medical oncology. Correct?

*A.* When I see a patient, I draw opinion [sic: upon] all of those specialties.

*Q.* I didn't ask you that.

*A.* Well –

*Q.* Can you give me a percentage of your professional time in medical oncology? Yes or no?

*A.* . . . Well, I think you asked that question three times and I told you that I have no way of separating them when I utilize all of my training when I see a patient.

* * *

*Q.* In the year immediately preceding [the alleged malpractice], you cannot state that you devoted a majority of your professional time to the active clinical practice of medical oncology. Yes or no?

*A.* Well, I think I already answered that. And it's – it stays the same. I told you what I did in medical oncology working at the FDA in medical oncology for over 20 hours practicing medical oncology for several hours more, however you want to define it.

-9-

When again asked whether he devoted a majority of his professional time to medical oncology, Dr. Sokol stated that he did not know how to answer the question and that "I've got five boards and I use them to the best of my abilities to take care of patients." Dr. Sokol also stated, in response to questioning by defense counsel concerning the amount of time he spent in the "active clinical practice of pharmacology[,]" "I can't practice medical oncology doing the best job I possibly can without knowing clinical pharmacology and utilizing it every time I practice medical oncology." Dr. Sokol indicated that he makes more money practicing radiation oncology than medical oncology but claimed that he thinks more about medical oncology. On further questioning, Dr. Sokol testified:

> *Q*. Of the two – I'm not counting the other several – do you do more radiation oncology than medical oncology now at the facilities you're at?

> *A*. Let's see. Being on call once a month about 20 hours that week, just being on call, two, four hours a day covering medical oncology, about another 20 hours a week, so that would be about – I don't know – 25 hours a week where I have a total medical oncology responsibility. And then seeing additional patients where I kind of have to balance and sort out –

> *Q*. Doctor –

> *A*. Well, I'm trying to give you some time.

> *Q*. My question is you want –

> *A*. You want – you want me to quantitate it. I'm trying to do it.

> *Q*. No. Give me the answer. Do you spend more time on radiation oncology than you do in medical oncology? Yes or no? Now in the past four or five years. Isn't that true, sir?

> *A*. The answer is maybe except for the fact that when I spend time in radiation oncology, I'm doing it as a medical oncologist in evaluating it for that purpose.

> *Q*. But you bill as a radiation oncologist when you do that. Correct?

> *A*. Oh, well, I just told you I make more money doing radiation oncology than doing medical oncology. I already told you that.

On redirect examination, Dr. Sokol indicated that it was difficult to separate out the time he spent as an internist from the time he spent as a medical oncologist. He then testified as follows:

> *Q*. Understanding that when you are practicing medical oncology, you're also practicing internal medicine?

> *A*. Yes.

-10-

*Q.* Are you able to state that a majority of your professional time is spent in medical oncology with that overlap in internal medicine?

*A.* Well, yes.

On recross examination, Dr. Sokol testified:

*Q.* When I asked you yes or no whether you can state that you spend a majority of your professional time in medical oncology, you couldn't answer, could you?

*A.* Well, you're asking me – you were asking me to divvy it up. And I don't know how to divvy it up.

\* \* \*

*Q.* By the way – what percentage of your time presently is medical radiation oncology? Can you give us that?

*A.* What percentage?

*Q.* Yeah. What percentage of your professional time?

*A.* I just told you that I combined them. It's very difficult.

*Q.* I'm asking this because we have laws in Michigan we have to follow. Can you tell me, yes or no, what percentage of your professional time is in medical radiation oncology?

*A.* Well, let's see. About the 80 hours that I work, I'd say maybe – let's see – hard to say. Let's see. Eighty hours. Maybe – and I'm just guessing because I –

*Q.* I don't want you to guess, Doctor.

*A.* Well, I'm just guessing because of the overlap and what I told you. The multiple specialties that I combine to be what I hope to be a good doctor. I would speculate that it would be 30 hours maybe out of the 80 that I work, maybe – maybe more, a little less. Hard to say for all of the reasons that I told you.

*Q.* Many times it's more than your medical oncology. Correct?

*A.* Well, I think I – we talked to you about, well, medical oncology when I was doing the FDA, that was 20 hours of pretty academic oncology –

*Q.* No. I mean –

-11-

*A.* Taking call[s] 20 hours every month in medical oncology, seeing patients at least three hours a day in medical oncology, being the only medical oncologist in the facility, another 15 hours a week. I mean it's –

*MR. SIEMION*: Okay. That's your answer. That's fine. Thank you very much. I have nothing further.

*BY MS. MACKENZIE*:

*Q.* I didn't hear the end of your answer. Another 15 hours of –

*A.* Well, research and teaching and writing papers and –

*Q.* In medical oncology?

*A.* Medical oncology and clinical pharmacology associated with the things we do in the practice of oncology.

We conclude that the trial court did not abuse its discretion in determining that plaintiff failed to establish that Dr. Sokol devoted a majority of his professional time to the practice or teaching of medical oncology in the year immediately preceding the alleged malpractice. It is true that Dr. Sokol's affidavit of merit filed with the complaint contained a conclusory assertion that he devoted a majority of his professional time to the practice or teaching of medical oncology during that time period. But Dr. Sokol's trial deposition testimony indicates that the conclusory assertion in his affidavit of merit lacks factual support. Upon repeated questioning on cross-examination, Dr. Sokol expressed that he had difficulty separating or divvying up the time he spent in his various specialties because he purportedly draws upon all of his specialties when seeing a patient. Although Dr. Sokol at various points did attempt to quantify the hours devoted to his various specialties, it is far from clear from his confusing testimony that he devoted a majority of his professional time to the practice or teaching of medical oncology during the relevant time period. Dr. Sokol did agree with plaintiff's counsel during redirect examination that he devoted a majority of his professional time to medical oncology "with that overlap in internal medicine[,]" but our Supreme Court's decision in *Woodard*, 476 Mich at 560, 566, indicates that an expert can only devote a majority of his professional time to one specialty. It is thus improper to combine Dr. Sokol's time spent in medical oncology with his time spent practicing internal medicine when considering whether he is qualified as an expert under MCL 600.2169(1)(b). See *Woodard*, 476 Mich at 577-578 (concluding that the proposed expert in *Hamilton* did not satisfy the same practice or instruction requirement of MCL 600.2169(1)(b) where the expert devoted a majority of his professional time to the subspecialty of treating infectious diseases rather than to practicing or teaching general internal medicine). Overall, the trial court's decision fell within the range of principled outcomes.[5]

---

[5] The parties present competing arguments regarding whether Dr. Sokol's affidavit of merit constitutes hearsay and whether it may be considered in assessing his qualification to testify under MCL 600.2169(1). But it makes no difference whether the affidavit of merit is considered.

Plaintiff asserts that the language in *Woodard* providing that an expert can only devote a majority of his or her professional time to one specialty constitutes mere obiter dictum.[6] Obiter dictum is an incidental remark or opinion that is not essential to the case. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 437; 751 NW2d 8 (2008). That is, language in a judicial opinion may be deemed obiter dictum if it is "in the nature of a gratuitous and irrelevant remark with no bearing on the case." *Detroit Free Press, Inc v Univ of Mich Regents*, 315 Mich App 294, 298; 889 NW2d 717 (2016) (citation omitted). The language in *Woodard* stating that a specialist can only devote a majority of his or her professional time to one specialty was not a mere gratuitous or irrelevant remark. Rather, it was central to the Supreme Court's reasoning for concluding that, in order to be qualified under MCL 600.2169(1), a plaintiff's expert is required to match only one of the defendant physician's specialties, i.e., the specialty engaged in by the defendant during the alleged malpractice, and to devote a majority of his or her professional time to that one most relevant specialty. See *Woodard*, 476 Mich at 560, 566-568. Further, this Court in *Kiefer*, 283 Mich App at 558 n 1, relied on the pertinent language in *Woodard* to conclude that the word "majority" means more than 50 percent of the proposed expert's professional time, given that the *Woodard* Court said that it is impossible for a physician to devote the majority of his or her professional time to more than one specialty. Because the language at issue in *Woodard* was not an incidental or gratuitous remark, it is not obiter dictum.

Plaintiff suggests that there is confusion regarding which opinion in *Woodard* was the majority opinion. We disagree. Justice Markman's lead opinion in *Woodard*, which is the opinion that we have been citing throughout this opinion, is unquestionably the majority opinion because it was supported by four of the seven justices of our Supreme Court. Indeed, Justice Markman's lead opinion in *Woodard* removed any doubt that it was the majority opinion:

> Contrary to Chief Justice Taylor's concurrence's assertion, *this* opinion is the *majority* opinion in this case given that it has four supporters – Justices Cavanagh, Weaver, and Kelly, and myself. Chief Justice Taylor's concurrence

As explained, the affidavit of merit contained merely a conclusory assertion that Dr. Sokol devoted a majority of his professional time to practicing or teaching medical oncology; this assertion fell apart at his deposition when he failed to provide sufficient supporting facts. See *Hamade v Sunoco, Inc (R & M)*, 271 Mich App 145, 163; 721 NW2d 233 (2006) (in the analogous context of summary disposition, "mere conclusory allegations within an affidavit that are devoid of detail are insufficient to create a question of fact.").

[6] Plaintiff's counsel arguably waived this issue at the motion hearing by stating, "I do agree that *Woodard* is the test. I agree that you can only spend a majority of your professional time in the active clinical practice of one specialty; that in this case it's medical oncology." "[A] waiver is a voluntary and intentional abandonment of a known right." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 374; 666 NW2d 251 (2003). "A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error." *Cadle Co v Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009) (citations omitted). By agreeing that an expert could only spend a majority of his or her professional time in the active clinical practice of one specialty as set forth in *Woodard*, plaintiff arguably abandoned the right to claim that this aspect of *Woodard* is merely obiter dictum rather than the governing test. We will nonetheless address plaintiff's argument.

sows confusion in an area of the law that is desperately in need of clarity. [*Woodard*, 476 Mich at 554 n 1.]

Plaintiff contends that the language in *Woodard* that a physician can only devote a majority of his or her professional time to one specialty is unrealistic because a physician may draw on more than one specialty in treating a patient. This argument should be directed to our Supreme Court. This Court is obligated to follow a decision of our Supreme Court until it has been overruled or modified by our Supreme Court. See *Paige v Sterling Hts*, 476 Mich 495, 524; 720 NW2d 219 (2006) (only our Supreme "Court has the authority to overrule one of its prior decisions. Until [our Supreme] Court does so, all lower courts and tribunals are bound by that prior decision and must follow it even if they believe that it was wrongly decided or has become obsolete.").

Plaintiff argues that it should be permitted to produce a substitute expert witness if this Court affirms the trial court's order striking Dr. Sokol. This argument is not preserved because it was not raised in the trial court. *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 95; 693 NW2d 170 (2005). "Although this Court need not address an unpreserved issue, it may overlook preservation requirements when the failure to consider an issue would result in manifest injustice, if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented." *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 387; 803 NW2d 698 (2010) (citation omitted). Plaintiff fails to acknowledge that this aspect of the issue is unpreserved and offers no argument for the applicability of any ground for addressing the unpreserved issue. The trial court's order did not dismiss plaintiff's claim against Dr. Agnone and MCS, and the trial court has not yet been presented with any request to allow a substitute expert witness. It is thus premature for this Court to address plaintiff's unpreserved argument. We note, however, that the failure to present an expert witness who is qualified under MCL 600.2169(1) to testify regarding the appropriate standard of practice or care has been held to warrant dismissal with prejudice. See *Woodard*, 476 Mich at 577-579.

We now address the issues raised by Dr. Romanelli and Woods in Docket No. 330416. In these remaining issues, we will refer to Dr. Romanelli and Woods as "defendants" because they are the only defendants appealing with respect to these issues.

Defendants argue that the trial court abused its discretion in denying defendants' motions seeking to strike plaintiff's proposed expert in cardiology, Dr. Meltzer, or to preclude his standard of care testimony. We disagree.

MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under MRE 702, then, "the proposed expert witness must be 'qualified' to render the proposed testimony. Generally, the expert may be qualified by virtue of 'knowledge, skill, experience, training, or education.' " *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 78; 684 NW2d 296 (2004) (footnotes and citations omitted). Also, MCL 600.2169(2) provides:

In determining the qualifications of an expert witness in an action alleging medical malpractice, the court shall, at a minimum, evaluate all of the following:

(a) The educational and professional training of the expert witness.

(b) The area of specialization of the expert witness.

(c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.

(d) The relevancy of the expert witness's testimony.

MRE 702 "requires the circuit court to ensure that each aspect of an expert witness's testimony, including the underlying data and methodology, is reliable." *Elher*, 499 Mich at 22.

MRE 702 incorporates the standards of reliability that the United States Supreme Court articulated in *Daubert v Merrell Dow Pharm, Inc*, [509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993)], in order to interpret the equivalent federal rule of evidence. Under *Daubert*, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. A lack of supporting literature, while not dispositive, is an important factor in determining the admissibility of expert testimony. Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible. [*Elher*, 499 Mich at 22-23 (footnotes, quotation marks and citations omitted).]

In addition, MCL 600.2955(1) provides:

In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

In short, "MCL 600.2955(1) requires the court to determine whether the expert's opinion is reliable and will assist the trier of fact by examining the opinion and its basis, including the facts, technique, methodology, and reasoning relied on by the expert, and by considering seven factors[.]" *Elher*, 499 Mich at 23. "[A]ll the factors in MCL 600.2955 may not be relevant in every case." *Id*. at 27; see also *Chapin v A & L Parts, Inc*, 274 Mich App 122, 137; 732 NW2d 578 (2007) (opinion by DAVIS, J.) ("[A]lthough MCL 600.2955(1) explicitly requires the trial court to *consider* all seven of the factors it enumerates, the statute does not require that each and every one of those seven factors must favor the proffered testimony."). "[I]t is within a trial court's discretion how to determine reliability." *Elher*, 499 Mich at 25. The proponent of expert testimony in a medical malpractice case has the burden of establishing that the expert is qualified under MRE 702 and MCL 600.2955, and that the evidence is relevant and admissible. *Id*. at 22.

"The inquiry is not into whether an expert's opinion is necessarily correct or universally accepted. The inquiry is into whether the opinion is rationally derived from a sound foundation." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008), quoting *Chapin*, 274 Mich App at 139 (opinion by DAVIS, J.). "Pursuant to *Daubert* and MRE 702, 'the trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes.' " *Unger*, 278 Mich App at 217, quoting *Chapin*, 274 Mich App at 127 (opinion by DAVIS, J.).

> The standard focuses on the scientific validity of the expert's methods rather than on the correctness or soundness of the expert's particular proposed testimony. An expert's opinion is admissible if it is based on the "methods and procedures of science" rather than "subjective belief or unsupported speculation." [*Unger*, 278 Mich App at 217-218 (citation omitted), quoting *Daubert*, 509 US at 590.]

In medical malpractice cases, the standard of care for a specialist is defined by "the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances . . . ." MCL 600.2912a(1)(b). "[T]he standard of care is not based on how a

particular health care professional would act." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 493; 668 NW2d 402 (2003) (citation omitted).

Defendants initially contend that Dr. Meltzer is not qualified to testify as an expert because he lacks specialized knowledge regarding the medical issues he purports to address. Defendants emphasize Dr. Meltzer's testimony that he is not an expert in the use of Novantrone, that he has never seen a patient who was taking Novantrone, and that he had no experience with Novantrone aside from the research he conducted in this case. Defendants also note Dr. Meltzer's testimony that he conducted research on the Internet to learn about Novantrone in preparation for his expert testimony in this case. Moreover, defendants argue that Dr. Meltzer therefore lacks the requisite knowledge and experience to qualify as an expert regarding the cardiotoxic effects of Novantrone and the information that a cardiologist should provide to other physicians. According to defendants, Dr. Meltzer is merely "parroting" information that he learned on the Internet.

We find defendants' argument unpersuasive. Dr. Meltzer is not holding himself out as an expert in Novantrone. Rather, Dr. Meltzer is testifying as an expert in cardiology. Dr. Meltzer has been a practicing cardiologist for 27 years. His knowledge in cardiology comes from attending medical school and continuing education that includes reviewing new studies that come out, reviewing clinical trials, reviewing peer-reviewed literature, and his 27 years of experience as a practicing cardiologist. Although Dr. Meltzer had no prior experience with Novantrone before his research in this case, Dr. Meltzer testified that he does have "experience with assessing patients on other cardiotoxic chemotherapeutic drugs. That gives you a foundation and an understanding of how to evaluate the changes you may see in a patient and relate that to whether or not the patient is suffering a cardiotoxic effect of the drug." Dr. Meltzer explained that he possesses a "general understanding of cardiotoxic chemotherapeutic drugs" in addition to the information he obtained in this case from researching articles concerning Novantrone. Dr. Meltzer further explained:

> I know from my training and experience how to evaluate patients on cardiotoxic chemotherapeutic agents. I've done it many times. I had to learn about Novantrone to see the details of Novantrone, and what the parameters were to form a fair and reasonable educated opinion as to how the drug is assessed, and how the cardiotoxic effects are assessed because it's different for every drug. . . . It's different for every drug and you have to be familiar with how to compile the information and make a reasonable and correct decision and recommendation.

Dr. Meltzer emphasized that he did not use the medical literature he obtained from the Internet to determine the standard of care; rather, he used the literature to determine the parameters by which a cardiologist would evaluate a patient who is taking Novantrone. Defendants' suggestion that Dr. Meltzer was merely "parroting" information he obtained from the Internet is therefore not supported by the record.

Moreover, Dr. Meltzer's standard of care criticisms of Dr. Romanelli were limited to the role of a cardiologist in determining whether and how to assess a patient who was taking Novantrone; Dr. Meltzer was not purporting to possess expertise more generally in Novantrone itself. Dr. Meltzer explained his first standard of care criticism of Dr. Romanelli as follows:

The first criticism is based on Dr. Romanelli's testimony that at the time he evaluated [Patricia] he had no understanding whatsoever of the drug Novantrone, no understanding of how it worked or no understanding of the parameters by which a patient taking the drug is to be evaluated. And in my opinion he violated the standard of care by offering a recommendation in light of the fact that he did not have any knowledge about the drug.

Dr. Meltzer noted that Dr. Romanelli had testified that he lacked any knowledge about Novantrone when Dr. Romanelli was asked by Patricia's treating physicians to perform a cardiac assessment of Patricia to determine the risks of using Novantrone. Following his cardiac evaluation, Dr. Romanelli wrote to the treating physician in January 2009 that Patricia was an acceptable risk for the medication. In Dr. Meltzer's view, "no reasonable or prudent board-certified cardiologist would make a recommendation concerning a drug when he has absolutely no knowledge of the drug, how the drug works, how you assess the drug or how to evaluate a patient for risks associated with the drug." When asked what Dr. Romanelli should have done, Dr. Meltzer testified:

Well, in my opinion he had to choose between one of two choices. One choice would be to research the drug and educate himself about the drug. And if that research left him satisfied that he was sufficiently knowledgeable to make a recommendation about the drug, then make a recommendation about the drug.

The second thing he could have done was to tell [the treating physician] I'm not qualified to evaluate this patient. I don't know anything at all about this drug. And you need to send her to a cardiologist who knows how to do a proper evaluation concerning a patient taking Novantrone.

Dr. Meltzer's second standard of care criticism was that Dr. Romanelli failed to recognize that Patricia was suffering a cardiotoxic effect of Novantrone:

When Dr. Romanelli evaluated [Patricia] he failed to recognize that she was demonstrating toxic effects, potentially toxicity effects of Novantrone therapy. And this included a fall in ejection fraction from 76 percent to 62 percent. She had an echocardiogram in July of 2008 that had an ejection fraction of 76 percent and in January of 2009 her ejection fraction was 62 percent.

In addition, the echo from July of 2008 demonstrated hyperdynamic left ventricular wall motion. And the echocardiogram performed in January of 2009 demonstrated wall motion. Both of these – I'm sorry, normal wall motion. Both of these findings, the fall in ejection fraction and the change in the character of the wall motion, are consistent with and suggestive of a cardiotoxic effect of the drug.

And third of all, in January of 2009 she was noted to have a new right bundle branch block on her electrocardiogram. And a right bundle branch block could be a sign of a cardiotoxic effect of the Novantrone.

The echocardiogram in January 2009 indicated that Patricia's ejection fraction was 62%, which was an 18% decrease from her ejection fraction in July 2008. Also, a stress test performed in

-18-

January 2009 indicated that Patricia's ejection fraction was 50%, which was more than a 30% drop from the July 2008 ejection fraction. Dr. Meltzer explained why the decreases in ejection fraction were significant: "In all of the literature that I reviewed it recommends that a fall in ejection fraction of greater than 10 percent and some of the literature says even 5 percent, indicates a cardiotoxic effect of Novantrone and the drug should be stopped." Dr. Meltzer further explained that

> those are very big changes in ejection fraction and when you look at a patient who is taking a chemotherapeutic – a cardiotoxic chemotherapeutic agent a fall in ejection fraction from 76 to 62, or 76 to 50 indicates a significant decrease in ejection fraction in cardiac function.

In short, the significant decrease in ejection fraction "suggests that the patient is suffering a cardiotoxic effect of the drug."

We conclude that Dr. Meltzer was properly qualified to testify as an expert in cardiology. His extensive knowledge and experience in practicing cardiology, including in performing cardiac evaluations of patients who are taking cardiotoxic chemotherapeutic drugs, supports the conclusion that he was qualified to testify concerning the appropriate standard of care for a cardiologist who is asked to perform a cardiac evaluation of a patient who is taking a chemotherapeutic drug such as Novantrone. Cf. *Elher*, 499 Mich at 24 ("There is no doubt that . . . plaintiff's sole expert regarding the standard of care[] was qualified to testify as an expert based on his extensive experience. . . . The question is whether [the expert's] opinion was sufficiently reliable under the principles articulated in MRE 702 and by the Legislature in MCL 600.2955."). Dr. Meltzer's lack of prior experience with the particular chemotherapeutic drug used in this case, Novantrone, does not disqualify him to testify concerning the standard of care for a cardiologist. There is no requirement in case law that an expert possess prior experience with exactly the same drug at issue in the case. Dr. Meltzer's standard of care criticisms were limited to areas that fell within his expertise as a practicing cardiologist. We are thus not persuaded by defendants' argument that Dr. Meltzer lacked the qualification to testify as an expert in this case.

Defendants next argue that Dr. Meltzer's standard of care testimony was unreliable. In particular, defendants focus on Dr. Meltzer's opinion that a decrease of the ejection fraction by 10% or more indicates that a cardiotoxic effect of the drug exists such that Dr. Romanelli should have recommended the discontinuation of the Novantrone therapy. Defendants contend that there is no peer-reviewed literature establishing that the standard of care requires a cardiologist to recommend ending the administration of Novantrone upon a 10% drop in ejection fraction. Defendants state that the FDA packaging for Novantrone does not refer to a 10% decrease in ejection fraction as a reason to discontinue the medication. Defendants characterize the medical articles cited by Dr. Meltzer as merely describing clinical trials and case studies of patients in which the authors and treating physicians chose to discontinue the medication upon a 10% decrease in ejection fraction. Defendants claim that these articles do not establish the standard of care for a cardiologist who is performing a cardiac evaluation of a patient taking Novantrone.

We find defendants' argument unconvincing. There was adequate support for Dr. Meltzer's standard of care testimony to conclude that it was reliable. The FDA-approved label

for Novantrone warns, in relevant part: "Additional doses of NOVANTRONE should not be administered to multiple sclerosis patients who have experienced either a drop in [ejection fraction] to below the lower limit of normal *or a clinically significant reduction in [ejection fraction] during NOVANTRONE therapy*." (Emphasis added.) Dr. Meltzer identified medical articles that supported his view that a 10% drop in ejection fraction was significant and warranted discontinuation of the medicine. Of particular note is Avasarala et al., *Rapid onset Mitroxantrone-induced cardiotoxicity in secondary progressive multiple sclerosis*, Multiple Sclerosis Journal (2003), in which the physician-authors studied 28 MS patients who were treated with Mitroxantrone[7] every three months. Five of the 28 patients displayed what the authors described as a "significant" decrease in ejection fraction of 10% or more, and the Mitroxantrone treatment was thus discontinued for those patients. *Id*. The authors stated that "[a] decline in [ejection fraction] of 10 percentage points or more should be viewed with concern." *Id*.

Defendants claim that none of the medical literature on which Dr. Meltzer relied was peer-reviewed,[8] but defendants fail to address the article summarized above or to explain why defendants believe it was not peer-reviewed. "A party cannot simply assert an error or announce a position and then leave it to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitchell v Mitchell*, 296 Mich App 513, 524; 823 NW2d 153 (2012) (quotation marks and citation omitted). Given defendants' inadequate briefing, this aspect of their argument may be deemed abandoned. *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). The above article was authored by multiple medical professionals. It was written in a formal, scholarly manner using technical medical terms and included citations to numerous other medical studies in endnotes. The article indicated that it was "accepted" more than two months after it was "received." This strongly suggests that there was a peer-review process before publication. We find nothing to support defendants' conclusory assertion that the article was not peer-reviewed. Also, the article was written outside of the context of litigation, and defendants articulate no basis for disagreement with the substantive content of the article. Overall, Dr. Meltzer's opinion was based not only on his experience and background but found general support in the FDA packaging information and additional support in the medical literature. Regardless of whether Dr. Meltzer's conclusion was necessarily correct, his opinion was "rationally derived from a sound foundation[ ]" and did not comprise mere speculation. See *Unger*, 278 Mich App at 217, quoting *Chapin*, 274 Mich App at 139 (opinion by Davis, J.). The trial court did not abuse its discretion in finding that Dr. Meltzer's standard of care testimony was reliable.

Next, we disagree with defendants' contention that Dr. Meltzer improperly used the medical literature in contravention of MRE 707. MRE 707 provides:

---

[7] Novantrone is the trade name for Mitroxantrone.

[8] Again, peer-reviewed literature is not always necessary to satisfy the requirements of MRE 702. *Elher*, 499 Mich at 28.

To the extent called to the attention of expert witnesses upon cross-examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice, are admissible for impeachment purposes only. If admitted, the statements may be read into evidence but may not be received as exhibits.

MRE 707 has been interpreted to bar the use of learned treatises as substantive evidence on direct examination, but the rule "does not absolutely forbid using learned treatises at other stages of a trial or for other reasons." *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 702; 630 NW2d 356 (2001). Defendants assert that Dr. Meltzer was repeatedly questioned about the literature he reviewed and that this essentially constitutes the use of the literature as direct evidence. Defendants fail to provide any record citations to support this assertion in the argument section of their brief on appeal for this issue (although defendants quote testimony concerning the literature earlier in their brief). "This Court will not search the record for factual support for a party's claim." *McIntosh v McIntosh*, 282 Mich App 471, 485; 768 NW2d 325 (2009) (citation omitted); see also MCR 7.212(C)(7) ("Facts stated must be supported by specific page references to the transcript, the pleadings, or other document or paper filed with the trial court."). In any event, although Dr. Meltzer referred to medical literature as supporting his opinion, he did not read into evidence any statements contained in the medical literature.[9] Defendants have failed to establish that the admission of Dr. Meltzer's testimony is a violation of MRE 707.

Next, defendants argue that the trial court erred in denying their motion to exclude Dr. Meltzer's allegedly new standard of care criticisms. Defendants contend that Dr. Meltzer offered new standard of care criticisms at his trial deposition, i.e., that (1) Dr. Romanelli should have

---

[9] That is, Dr. Meltzer did not read into evidence any statements from a specific article by directly quoting it. In explaining his understanding of the literature, Dr. Meltzer arguably paraphrased it by stating, "In the medical literature that I reviewed it consistently says that the risk of cardiotoxicity increases with the risk, with the increasing doses of the drug." Dr. Meltzer also stated, "In all of the literature that I reviewed it recommends that a fall in ejection fraction of greater than 10 percent and some of the literature says even 5 percent, indicates a cardiotoxic effect of Novantrone and the drug should be stopped." Again, however, defendants' brief fails to include record citations to indicate the specific portions of Dr. Meltzer's testimony that they are challenging in this issue. Defendants also fail to address whether a general statement paraphrasing medical literature, as opposed to a direct quotation of a specific article, amounts to a violation of MRE 707, nor do defendants cite case law addressing that issue. "A party cannot simply assert an error or announce a position and then leave it to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitchell*, 296 Mich App at 524 (quotation marks and citation omitted). Given defendants' inadequate briefing, this aspect of their argument may be deemed abandoned. *Prince*, 237 Mich App at 197.

-21-

informed Patricia's other medical providers that her computer-generated ejection fraction had fallen to 50% in a January 2009 stress test, and (2) Dr. Romanelli should have ordered a multigated acquisition (MUGA) scan to determine Patricia's correct ejection fraction. Therefore, defendants argue, Dr. Meltzer's new standard of care criticisms should be excluded. We disagree.

MCR 2.302(E)(1) provides, in relevant part:

*Duty to supplement.* A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information acquired later, except as follows:

(a) A party is under a duty seasonably to supplement the response with respect to a question directly addressed to

(*i*) the identity and location of persons having knowledge of discoverable matters; and

(*ii*) the identity of each person expected to be called as an expert witness at trial, the subject matter on which the expert is expected to testify, *and the substance of the expert's testimony*. [Emphasis added.]

At his trial deposition, Dr. Meltzer testified that Dr. Romanelli should have informed Patricia's treating physicians that, according to a stress test performed in January 2009, her ejection fraction had fallen to 50%. Dr. Meltzer noted that, although the body of Dr. Romanelli's report reflected that the computer-generated ejection fraction was 50%, Dr. Romanelli changed the ejection fraction to greater than 60% in the conclusion of his report, on the basis of Dr. Romanelli's subjective assessment. Defendants contend that Dr. Meltzer had not disclosed during his discovery deposition that he was making a standard of care criticism related to Dr. Romanelli's failure to report the 50% ejection fraction to the other medical providers. We disagree. In his discovery deposition, Dr. Meltzer testified:

The next violation of the standard of care is that he arbitrarily changed the value of the ejection fraction on the Persantine stress test from sixty to fifty [sic: 50 to 60] based on his subjective evaluation that the left ventricular contraction looked normal to him so he gave it a normal number of sixty.

The next violation of the standard of care is that he failed to recognize, likely due to his ignorance of Novantrone, that the patient's change in ejection fraction, change in wall motion, new right bundle branch block were all suggestive of Novantrone-induced cardiotoxicity and that a more thorough workup was indicated.

A consequence of his changing the ejection fraction from fifty to sixty on the stress test and ignoring or not being aware of the ejection fraction of seventy-six and sixty-two percent, in my mind, prevented him from thinking about getting a different kind of estimation of her stress test, namely a MUGA, which is more

accurate, so that he could ascertain, get a better idea of what her ejection fraction truly is.

* * *

[Dr. Romanelli] violated the standard of care. What he did was not consistent with what a reasonable and prudent cardiologist would do. You have an eighteen percent fall in ejection fraction and then you have a fall to fifty percent, which is a thirty-six percent fall in ejection fraction, and you don't make a recommendation to stop the drug, that's a violation of the standard of care.

In his discovery deposition, then, Dr. Meltzer stated that it was a violation of the standard of care for Dr. Romanelli not to recommend discontinuation of Novantrone therapy in light of the fall in the ejection fraction to 50%. Recommending the discontinuation of Novantrone due to the ejection fraction of 50% implies informing the medical providers of the 50% ejection fraction. Dr. Meltzer also indicated in his discovery deposition that it was a violation of the standard of care for Dr. Romanelli to change the ejection fraction of 50% that was generated by the computer during the stress test to 60% on the basis of Dr. Romanelli's subjective assessment, which again suggests that the 50% ejection fraction finding should have been communicated to the other medical providers. Although not phrased identically to his trial deposition testimony, it was sufficiently clear from Dr. Meltzer's discovery deposition that he was critical of Dr. Romanelli for failing to inform the other medical providers of the 50% ejection fraction finding.

Defendants also claim that Dr. Meltzer first testified during his trial deposition that it was a violation of the standard of care for Dr. Romanelli to fail to order a MUGA scan in order to determine Patricia's true ejection fraction. According to defendants, Dr. Meltzer did not state during his discovery deposition that the failure to order a MUGA scan violated the standard of care. Again, we conclude that, while not stated in precisely the same manner as in Dr. Meltzer's trial deposition testimony, Dr. Meltzer's discovery deposition testimony adequately informed defendants of Dr. Meltzer's view on this point. In his discovery deposition, Dr. Meltzer testified that a MUGA scan is the most accurate way to measure ejection fraction and that Patricia did not undergo a MUGA scan. And, as quoted above, Dr. Meltzer also testified in his discovery deposition that, as a result of Dr. Romanelli's changing the ejection fraction from 50% to 60% and being unaware of the earlier ejection fraction findings, Dr. Romanelli did not consider ordering a MUGA scan, which is a more accurate way of determining a patient's ejection fraction. It is thus clear from Dr. Meltzer's discovery deposition testimony that a MUGA scan is the most accurate way to determine ejection fraction and that a MUGA scan was warranted given the change in Patricia's ejection fraction from earlier findings. While not explicitly phrased in terms of being a violation of the standard of care, the discovery deposition testimony concerning the MUGA scan, considered in its entirety, sufficed to apprise defendants of Dr. Meltzer's opinion on the matter.

Defendants further argue that the complaint failed to apprise defendants of Dr. Meltzer's two allegedly new standard of care criticisms discussed above. Defendants note that, before deciding the motion at issue here, the trial court had entered a consent order limiting plaintiff to theories pleaded in the complaint unless the trial court permitted an amendment pursuant to MCR 2.118. We disagree with defendants' argument. "[T]he primary function of a pleading in

Michigan is to give notice of the nature of the claim or defense sufficient to permit the opposite party to take a responsive position." *Stanke v State Farm Mut Auto Ins Co*, 200 Mich App 307, 317; 503 NW2d 758 (1993). A complaint must contain "[a] statement of the facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend[.]" MCR 2.111(B)(1). Plaintiff's allegations were sufficient to provide defendants with notice of the nature of the claims. The complaint included allegations that Dr. Romanelli failed to communicate pertinent information to the other specialists and to appropriately collaborate and coordinate with the other specialists; these allegations encompass Dr. Meltzer's theory that Dr. Romanelli should have informed the other medical providers of the 10% decrease in ejection fraction. The failure to order a MUGA scan was encompassed by allegations of a failure to ensure that Patricia is assessed for cardiac signs and symptoms. Overall, the allegations in the complaint sufficed to reasonably inform defendants of the nature of the claims.

Finally, defendants argue that the trial court abused its discretion in denying their motion to exclude the proximate causation testimony of Dr. Meltzer and Dr. Sokol, which defendants characterize as speculative and unsupported. We disagree.[10]

"[A] plaintiff's prima facie case of medical malpractice must draw a causal connection between the defendant's breach of the applicable standard of care and the plaintiff's injuries." *Craig*, 471 Mich at 90. Expert testimony is required to establish causation in a medical malpractice action. *Teal v Prasad*, 283 Mich App 384, 394; 772 NW2d 57 (2009). " 'Proximate cause' is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause." *Craig*, 471 Mich at 86 (footnote and citation omitted).

> As a matter of logic, a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries.
>
> Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or "but for") that act or omission. While a plaintiff need not prove that an act or omission was the *sole* catalyst for his injuries, he must introduce evidence permitting the jury to conclude that the act or omission was *a* cause. [*Id.* at 87 (footnotes and citations omitted).]

There must be proof of "more than a mere possibility or a plausible explanation." *Id.* (footnote and citation omitted).

---

[10] We earlier determined that the trial court did not abuse its discretion in concluding that Dr. Sokol lacked the requisite qualification under MCL 600.2169(1)(b) to testify as an expert in medical oncology about the standard of care applicable to Dr. Agnone. This does not preclude Dr. Sokol from testifying regarding causation. See *Woodard*, 476 Mich at 558 n 4 ("MCL 600.2169(1) only applies to expert testimony on the appropriate standard of practice or care; it does not apply to other kinds of expert testimony, such as expert testimony on causation.").

[A] plaintiff establishes that the defendant's conduct was a cause in fact of his injuries only if he sets forth specific facts that would support a reasonable inference of a logical sequence of cause and effect. A valid theory of causation, therefore, must be based on facts in evidence. And while the evidence need not negate all other possible causes, this Court has consistently required that the evidence exclude other reasonable hypotheses with a fair amount of certainty. [*Id*. at 87-88 (quotation marks, brackets, footnotes and citations omitted).]

"It is axiomatic in logic and in science that correlation is not causation. This adage counsels that it is error to infer that A causes B from the mere fact that A and B occur together." *Id*. at 93 (footnote and citation omitted). "Where the connection between the defendant's negligent conduct and the plaintiff's injuries is entirely speculative, the plaintiff cannot establish a prima facie case of negligence." *Id*. (footnote and citation omitted).

In this case, Dr. Meltzer testified that as a result of receiving 16 doses of Novantrone for 16 consecutive months, Patricia developed a severe cardiomyopathy, meaning that her heart did not work or pump correctly. Dr. Meltzer noted that this conclusion was supported by the diagnosis of Dr. Romanelli's partner, Dr. David Graham, who examined Patricia in the hospital in January 2010 and concluded that she was suffering from "dilated cardiomyopathy likely nonischemic in nature related to the cardiac toxicity of her chemotherapy that she was receiving for multiple sclerosis." Dr. Meltzer opined that the cardiomyopathy was caused by the cardiotoxic effects of Novantrone. Dr. Meltzer explained that Patricia "didn't have any reason to develop a cardiomyopathy. So there's no other causative factor and Novantrone is known to cause a cardio, to have the potential to cause a cardiomyopathy." In Dr. Meltzer's view, Patricia would not have developed a dilated cardiomyopathy if the Novantrone had been discontinued in January 2009. He explained:

She had evidence of cardiomyopathy in January of 2009. But what is known about Novantrone is when you stop the drug the patient has the potential to have the cardiotoxic effect slowly go away.

So that, in my opinion, more likely than not, she would not have gone on to develop a dilated cardiomyopathy and severe mitral regurgitation had the Novantrone been stopped in January of 2009.

According to Dr. Meltzer, if Dr. Romanelli had recognized the significant decrease in ejection fraction and recommended the discontinuation of Novantrone therapy in January 2009, Patricia "would not have developed cardiotoxicity to the extent that she did and more likely than not she would not have developed the severe cardiac dysfunction and valvular – mitral valvular regurgitation that required her to be operated on." Dr. Meltzer noted that Patricia "was already suffering cardiotoxic effects of the drug in January of 2009. And she was receiving subsequent, relatively close to monthly treatments with the drug, and that would have only added to the cardiotoxic effects of the drug and it would have been manifested as a consistent decline in her ejection fraction." Dr. Meltzer further explained: "The combination of the drug induced cardiomyopathy and the mitral regurgitation basically placed her in the state where she deteriorated into a condition called cardiogenic shock. And she, therefore, required surgery on her mitral valve in order to try to improve her cardiac performance to the point that she could

-25-

survive." Patricia underwent surgery for this cardiac condition and then developed complications following the surgery that led to her death.

Dr. Sokol provided similar testimony. Dr. Sokol opined that the doses of Novantrone administered to Patricia were more concentrated and dense and given at more frequent intervals than were recommended for safe usage, which added significantly to the toxicity of the drug. Dr. Sokol stated that the frequency with which Novantrone was administered added "significantly to the inability of the drug to be metabolized and it adds to the concentration of a toxin that exists for a much longer period of time. There is no time for a washout. And, of course, the concentration of the drug is much higher for a period of time." In Dr. Sokol's view, Patricia would not have suffered the same degree of cardiotoxicity that she did if the drug had been stopped after six doses in January 2009, which was when the significant decline in ejection fraction was measured. Dr. Sokol explained that if the Novantrone administration had ended in January 2009, Patricia "would have gotten only, what, 30 to 40 percent of the dose that she [ultimately] got. So if you're saying that, gee, she was a dead duck at six months, well, I hate to see her shot 10 more times with additional [sic] to make sure the deed was done." Dr. Sokol noted that it was "[n]ot just my opinion that she sustained cardiotoxic death, to a large extent contributed to [sic] the dose of Novantrone and the way it was given, but apparently it was the opinion of the people that took care of her as well." Dr. Sokol expressed agreement with Dr. Graham's consultation notes in the hospital records concluding that Patricia had suffered a dilated cardiomyopathy "related to the cardiac toxicity of her chemotherapy that she was receiving for multiple sclerosis."

Dr. Sokol also indicated that the cardiotoxicity of Novantrone increases with each dose:

*Q.* And – okay. Moving on. Novantrone can lead to cardio toxicity with the first dose. Correct?

*A.* To a very small extent, that's true.

*Q.* But you cannot state at any point in time what dose could have tipped this patient over into the area where you claim – the area you claimed occurred? You can't isolate one dose, can you?

*A.* If that's an accusation, I deny it because that would be an inaccurate accusation when you say I can't do that.

*Q.* Okay.

*A.* Because there is a clearcut statistical association between the early doses, the low doses, and the increasing incidents of cardio toxicity as the dose increases particularly above the limits that have been defined.

*Q.* Doctor, you indicated that the numbers – the risk percentage is small with cardio toxicity for Novantrone, two or three percent, correct?

*A.* Oh, you're talking about Novantrone when it's given every three months. And that's drawn from the studies that have utilized it every three

-26-

months. But if you draw appropriately from the studies that were done every month, you will find a significantly higher incidents [sic] of cardio toxicity.

*Q.* Is it dose-related, Doctor, not frequency-related?

*A.* It's both.

*Q.* If it's dose-related, don't we know what the percentage risks are at certain levels or do you?

*A.* I just told you it's both.

In short, then, Dr. Meltzer opined that, more likely than not, Patricia would not have developed the severe cardiac condition that ultimately led to her death if the Novantrone therapy had been discontinued in January 2009, and Dr. Sokol testified that Patricia would not have suffered the degree of cardiotoxicity that she did if the Novantrone had been stopped after six doses in January 2009. Notably, defendants do *not* challenge the reliability of the experts' testimony that Patricia died as a result of Novantrone-induced cardiogenic shock. As discussed, medical literature and FDA packaging information reflect the risk of cardiac complications arising from the use of Novantrone, and Dr. Romanelli's own partner who treated Patricia concluded that she suffered a dilated cardiomyopathy related to the cardiac toxicity of her chemotherapy drug. Rather than challenging the theory that Patricia died from cardiac complications arising from the use of Novantrone, defendants claim that there is no support for the opinion that Patricia would not have suffered the degree of cardiotoxicity that she suffered if the Novantrone administration had ended in January 2009. Defendants take note of testimony from plaintiff's neurology expert, Dr. Douglas Jeffery, that one dose of Novantrone could cause what occurred in this case, that a patient could suffer a delayed reaction to Novantrone months or years later, and that the same injury could have occurred even if the appropriate dosage had been given. Defendants also note that Dr. Sokol, when asked whether the first dose of Novantrone can lead to cardiotoxicity, stated, "To a very small extent, that's true."

The flaw in defendants' argument is that it fails to take into account the increased risk of cardiotoxicity with each dose of Novantrone and the fact that, in January 2009, Patricia had only received six of the 16 doses that she ultimately received. Defendant-oncologist Dr. Agnone acknowledged in his deposition that the risk from taking Novantrone increases with each milligram. Most of the doses of Novantrone were administered to Patricia after January 2009. The frequent and dense doses after January 2009 therefore may reasonably be determined to have not only infused more of this drug into Patricia's body but also, as Dr. Sokol explained, prevented her body from having an opportunity to metabolize the drug and wash out the toxins. The risk of complications with only the first dose of Novantrone, on which defendants focus, was very small, according to Dr. Sokol. Defendants seem to suggest that there must be medical literature explicitly addressing the precise question of whether a patient would suffer complications if the Novantrone administration had been discontinued after six doses. Such a fact-specific medical article conclusively addressing the exact situation presented here is not required. See *Unger*, 278 Mich App at 220 ("Indeed, it is obvious that not every particular factual circumstance can be the subject of peer-reviewed writing."). Utilizing the knowledge and experience they have obtained in their respective fields, Dr. Meltzer and Dr. Sokol posited a

causation theory that was reasonably extrapolated from an established scientific foundation as reflected in the medical literature and FDA packaging information regarding the cardiac risks of this drug. Their testimony was sufficiently reliable to be admitted for a jury to consider. See *Unger*, 278 Mich App at 220 ("When expert witnesses offer conflicting opinions, it is solely for the jury to determine which expert is more credible."). The trial court properly denied defendants' motion to exclude the proximate causation testimony of plaintiffs' experts.

Affirmed in both appeals. In Docket No. 330330 defendants Dr. Agnone and MCS, as the prevailing parties, may tax costs pursuant to MCR 7.219. In Docket No. 330416, plaintiff, as the prevailing party, may tax costs pursuant to MCR 7.219.


/s/ Karen M. Fort Hood
/s/ Mark J. Cavanagh